# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:** _____

**Filing Date: March 8, 2018**

**NOS. S-1-SC-35279, -35289, & -35290**

**GILA RESOURCES INFORMATION PROJECT, AMIGOS BRAVOS, TURNER RANCH PROPERTIES, L.P., STATE OF NEW MEXICO, ex rel., HECTOR BALDERAS, Attorney General, and WILLIAM C. OLSON,**

      Appellants-Petitioners,

v.

**NEW MEXICO WATER QUALITY CONTROL COMMISSION**,

      Appellee-Respondent,

and

**FREEPORT-MCMORAN CHINO MINES COMPANY, FREEPORT-MCMORAN TYRONE, INC., FREEPORT-MCMORAN COBRE MINING COMPANY, and NEW MEXICO ENVIRONMENT DEPARTMENT,**

      Intervenors-Respondents.

**ORIGINAL PROCEEDING ON CERTIORARI**

New Mexico Environmental Law Center
Douglas Meiklejohn
Jaime Park
Eric D. Jantz
Jonathan Mark Block
R. Bruce Frederick
Santa Fe, NM

for Petitioners Gila Resources Information Project, Amigos Bravos, and Turner Ranch Properties, L.P.

Hector H. Balderas, Attorney General
Tannis L. Fox, Assistant Attorney General
Santa Fe, NM

for Petitioner State of New Mexico

Charles F. Noble
Santa Fe, NM

for Petitioner William C. Olson

Hinkle Shanor LLP
Thomas Mark Hnasko
Gary W. Larson
Julie Ann Sakura
Santa Fe, NM

for Respondent

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Stuart R. Butzier
Emil John Kiehne
Albuquerque, NM

Gallagher & Kennedy, P.A.
Dalva Lon Moellenberg
Anthony J. (T.J.) Trujillo
Albuquerque, NM

Law Office of John J. Kelly, P.A.
John Joseph Kelly
Albuquerque, NM

for Intervenors-Respondents Freeport McMoran Chino Mines Company, Freeport-McMoran Tyrone, Inc., Freeport-McMoran Cobre Mining Company

New Mexico Environment Department
Andrew P. Knight
Albuquerque, NM

Kathryn Suzanne Becker
Santa Fe, NM

for Intervenor-Respondent New Mexico Environment Department

# OPINION

**NAKAMURA, Chief Justice.**

{1}     In September 2013, the New Mexico Water Quality Control Commission (the Commission) adopted the Copper Mine Rule, 20.6.7 NMAC (Copper Rule). Petitioners argue that the Copper Rule violates the Water Quality Act (WQA), NMSA 1978, §§ 74-6-1 to -17 (1967, as amended through 2013) because it is premised on an impermissible construction of the statutory phrase "place of withdrawal of water for present or reasonably foreseeable future use." Section 74-6-5(E)(3). Petitioners assert that, as a consequence of this impermissible construction of the statutory phrase, the Copper Rule permits rather than prevents groundwater contamination at open pit copper mining facilities. We reject these arguments, conclude that the Copper Rule is premised on a permissible construction of the statutory phrase, and affirm the Commission's decision to adopt the Copper Rule.

## I.     BACKGROUND

{2}     The WQA was enacted in 1967. Its purpose is "to abate and prevent water pollution." *Bokum Res. Corp. v. N.M. Water Quality Control Comm'n*, 1979-NMSC-090, ¶ 59, 93 N.M. 546, 603 P.2d 285. Prior to 2009, the WQA did not allow the Commission to specify by rule the "method to be used to prevent or abate

water pollution . . . ." Section 74-6-4(D) (2003). Amendments to the WQA enacted in 2009 altered this legislative framework.

{3} The 2009 amendments to the WQA directed the Commission to adopt regulations particular to specific industries, including the copper mining industry, specifying "the measures to be taken to prevent water pollution and to monitor water quality." Section 74-6-4(K). The regulations were to be developed by the New Mexico Environment Department (NMED). Section 74-6-4(K) ("The constituent agency shall establish an advisory committee . . . to advise the constituent agency on appropriate regulations to be proposed for adoption by the commission."); Section 74-6-2(K)(1) ("'[C]onstituent agency' means . . . the department of environment[.]"). The NMED engaged in an open rulemaking process that resulted in the Copper Rule, which the Commission adopted when it entered its Order and Statement of Reasons on September 25, 2013. Petitioners appealed the Commission's decision to adopt the Copper Rule. *See Gila Res. Info. Project v. N.M. Water Quality Control Comm'n*, 2015-NMCA-076, ¶ 1, 355 P.3d 36.

{4} The Court of Appeals rejected Petitioners' contention that the Copper Rule violates the WQA and affirmed the Commission's order adopting it. *Id.* ¶¶ 2, 19, 61. We granted certiorari to review Petitioners' requests that we set aside the Copper

Rule and remand this matter to the Commission with instructions that it promulgate a new rule that complies with the WQA.

**II.     DISCUSSION**

{5}     The Commission's order adopting the Copper Rule shall be set aside if it is "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law."  Section 74-6-7(B).  Petitioners contend that the Commission's decision to adopt the Copper Rule is not in accordance with law because the Copper Rule is inconsistent with and violates the WQA.

{6}     Petitioners do not ask us to evaluate the lawfulness of the Copper Rule under some specific set of circumstances; the Copper Rule has not yet been applied at a copper mine.  Instead, Petitioners mount a facial challenge to the Copper Rule.  *See Am. Hosp. Ass'n v. N.L.R.B.*, 499 U.S. 606, 619 (1991) ("This case is a challenge to the validity of the entire rule in all its applications.").  The inquiry before us is whether the Copper Rule is a permissible exercise of the Commission's statutory authority, *N.M. Mining Ass'n v. N.M. Water Quality Control Comm'n*, 2007-NMCA-010, ¶ 21, 141 N.M. 41, 150 P.3d 991, and Petitioners must establish

3

that no set of circumstances exist where the Copper Rule could be valid. *Reno v. Flores*, 507 U.S. 292, 301 (1993).

{7}     Petitioners make varying specific claims in support of their assertion that the Copper Rule violates the WQA. To meaningfully discuss those specific claims, we must first examine how open pit copper mining is conducted. We then provide an overview of the Copper Rule focusing on the provisions that are central to its function as a regulatory tool and to which Petitioners object. Finally, we consider Petitioners' specific arguments.

**A.     Copper Mining**

{8}     Petitioners contend that "the undisputed testimony and other evidence in the record show[s] that open pit copper mines have caused tens of thousands of acres of ground water pollution in New Mexico and that this pollution persists for hundreds of years." Nevertheless, the legality of open pit mining is not disputed and no party advocates banning this form of mining.

{9}     According to Respondents, open pit copper mining is the typical method to mine copper. An "open pit" is "the area within which ore and waste rock are exposed and removed by surface mining." 20.6.7.7(B)(41) NMAC. For context of the scale of open pit mines, one such mine in Grant County, New Mexico is 11,600 feet long,

4

8,500 feet wide, and 2,000 feet deep. Open pits eventually become deep enough to reach the groundwater table. At that point, water must be pumped out of the open pit to mine it any deeper.

{10}    As the depth of the open pit increases, gravity causes groundwater in the vicinity of the open pit to flow towards the bottom of the pit. The area affected by this hydrological phenomenon is referred to as the "[a]rea of open pit hydrologic containment." 20.6.7.7(B)(5) NMAC ("'Area of open pit hydrologic containment' means . . . where ground water drains to the open pit and is removed by evaporation or pumping, and is interior to the department approved monitoring well network installed around the perimeter of an open pit[.]"). Some surface waters also drain into the open pit. "[T]he area in which storm water drains into an open pit and cannot feasibly be diverted by gravity outside the pit perimeter" is referred to as the "[o]pen pit surface drainage area." 20.6.7.7(B)(42) NMAC. Petitioners aver that, while the area of open pit hydrologic containment and open pit surface drainage area are distinct in that one concerns groundwater and the other surface water, the areas both exist as a consequence of the open pit, exist at the same general location, and are properly considered as companion concepts.

{11}     The actual extraction of copper from mined rock occurs at mine "units."  A "[u]nit" is "a component of a mining operation including but not limited to processing, leaching, excavation, storage, stockpile or waste units."  20.6.7.7(B)(63) NMAC.  Some of the mined rock contains useful copper ore; other mined rock is waste.  "Waste rock" is "all material excavated from a copper mine facility that is not ore or clean top soil."  20.6.7.7(B)(65) NMAC.  Waste rock is typically placed in waste rock stockpiles.  A variety of methods are used to process the ore.

{12}     Some ore is placed into leach stockpiles, which are "piles associated with mining disturbances that have been leached, are currently being leached or have been placed in a pile for the purpose of being leached."  20.6.7.7(B)(33) NMAC.  Once the leach stockpile is formed, acidic solution is poured onto it.  Copper is extracted at the bottom of the leach stockpile and piped to a processing plant.

{13}     Other ore is sent to a concentrator where it is ground into small particles and mixed with water to form a slurry.  Some of the slurry becomes copper, and other portions of it become "tailings," which are "finely crushed and ground rock residue and associated fluids discharged from an ore milling, flotation beneficiation and concentrating process."  20.6.7.7(B)(59) NMAC. Tailings are deposited in "[t]ailings

impoundments," which can be as large as several square miles. 20.6.7.7(B)(60) NMAC.

{14} All of these copper extraction processes, as well as waste rock stockpiles, can cause discharges that impact groundwater quality. For this reason, mining units are frequently located near the open pit and within the open pit surface drainage area so as to capture any discharges at a mining unit.

{15} The open pit itself is also capable of generating discharges that may contaminate groundwater. When rain water contacts the exposed surfaces of the open pit, acidic solutions can be generated. Other sources of possible contaminant discharge at open pit mining facilities include "surface impoundments that store or retain process water; wastewater or storm water runoff that has contacted mined materials; pipeline and tank systems used to convey or store process water; and equipment washing facilities."

**B.    The Copper Rule**

{16} The Copper Rule is comprised of thirty-nine different sections and a myriad of subsections which address all manner of discharge control for the copper mining industry. It is a "supplement [to] the general permitting requirements . . . to control discharges of water contaminants specific to copper mine facilities . . . ."

7

20.6.7.6 NMAC. The "purpose" of the Copper Rule, as stated by the Commission, "is to control and contain discharges of water contaminants specific to copper mine facilities and their operations to prevent water pollution so that ground water meets the quality standards of 20.6.2.3103 NMAC at locations of present and potential future use." The groundwater quality standards set out at 20.6.2.3103 NMAC (3103 standards) specify the allowable pH range and maximum allowable contaminant concentration for groundwater. 20.6.2.3103(A)-(C) NMAC. Groundwater is polluted when the contaminant concentration levels identified in the 3103 standards are exceeded.

{17} Petitioners' objections to the Copper Rule arise from two of its features. First, the Copper Rule specifies that, "[d]uring operation of an open pit, the standards of 20.6.2.3103 NMAC do not apply within the area of open pit hydrologic containment." 20.6.7.24(D) NMAC. Second, the Copper Rule requires an applicant for a discharge permit to install monitoring wells in specific locations at an open pit mining facility. 20.6.7.28(A) NMAC. The monitoring wells must be placed "around the perimeter and downgradient of each open pit, leach stockpile, waste rock stockpile, tailings impoundment, process water impoundment, and impacted stormwater impoundment." 20.6.7.28(B) NMAC. The monitoring wells must also be installed "as close as

8

practicable" to the open pit or mining unit in order "to detect an exceedance(s) or a trend towards exceedance(s) of the applicable standards at the earliest possible occurrence, so that investigation of the extent of contamination and actions to address the source of contamination may be implemented as soon as possible." *Id.* "The [NMED] may require additional wells around the perimeter of mine units that are underlain by areas where ground water flow directions are uncertain" and may "require additional monitoring wells at any other unit of a copper mine facility that has the potential to cause an exceedance of applicable standards . . . ." *Id.*

**C.    Petitioners' Arguments**

**1.    Section 74-6-5(E)(3) and "place of withdrawal"**

{18}    Petitioners' primary contention in this appeal is that the Copper Rule permits the copper mining industry to pollute groundwater above the 3103 standards wherever its mines are located. It does this, Petitioners explain, by waiving compliance with 3103 standards within the area of open pit hydrologic containment and by assessing the impacts of mining on groundwater at monitoring wells rather than at the open pit and mining units themselves. This is, Petitioners argue, inconsistent with the plain language of Section 74-6-5(E)(3), which states that

9

> [t]he [NMED] shall deny any application for a permit or deny the certification of a federal water quality permit if:
>
> . . . .
>
> (3) the discharge would cause or contribute to water contaminant levels in excess of any state or federal standard. Determination of the discharge's effect on ground water shall be measured at any place of withdrawal of water for present or reasonably foreseeable future use.

This provision is incorporated into the Copper Rule at 20.6.7.10(J)(3) NMAC, which requires compliance with Section 74-6-5(E)(3).

{19}    According to Petitioners, the WQA's mandate that determination of the effects of a discharge shall be measured at "any place of withdrawal of water for present or reasonably foreseeable future use" is "clear and unambiguous." A place of withdrawal, Petitioners argue, is "a place where ground water is presently being used or foreseeably could be used in the future." Petitioners assert that Section 74-6-5(E)(3) requires a site specific evaluation of whether a discharge will contaminate groundwater with present or future use and argue that, "[i]f any discharge will pollute above standards groundwater with present or reasonably foreseeable future use, the permit application must be denied."

{20}    Petitioners claim that the Copper Rule violates the WQA because it permits contamination of groundwater at the open pit and at mining units without a site

10

specific determination. In fact, according to Petitioners, the Copper Rule does not require any determination at all whether the open pit and mining units are places of withdrawal because the Copper Rule, they claim, operates from the errant supposition that a "[p]lace of [w]ithdrawal is not a 'place' that exists apart from a copper mine. Its existence and location depend entirely on the location of monitoring wells installed at a particular copper mine." It is essential that the preceding quote from Petitioners' briefing is understood, and we will risk redundancy to ensure that it is.

{21} Petitioners understand the Copper Rule to require an assessment of whether groundwater exists at a place of withdrawal *only after a mine is in place*. This is because, Petitioners assert, the monitoring wells establish the locations of places of withdrawal at open pit copper mining facilities. Petitioners contend that this is inconsistent with the plain language of Section 74-6-5(E)(3). According to Petitioners, the place of withdrawal language in Section 74-6-5(E)(3) unambiguously requires a determination of whether groundwater at any given location exists at a place of withdrawal prior to and independent of the installation of a mine or monitoring wells. For the reasons that follow, we reject Petitioners' contention that the meaning of Section 74-6-5(E)(3) is discernible from its plain language and that its application at an open pit copper mine facility is plainly determinable.

*a.      Analysis of the plain language of Section 74-6-5(E)(3)*

{22}      Section 74-6-5(E)(3) does *generally* require the NMED to deny a discharge permit if the anticipated discharge "would cause or contribute to water contaminant levels in excess of [3103 standards]."  But Section 74-6-5(E)(3) *specifies* how contaminant levels shall be measured to determine if 3103 standards have been exceeded: "Determination of the discharge's effect on ground water shall be measured at any place of withdrawal of water for present or reasonably foreseeable future use." *Id.*  This specification is significant.

{23}      The WQA requires mandatory denial of a discharge permit *only where* the discharge has measurable adverse effects at "a place of withdrawal" and *only if* the groundwater at that "place of withdrawal" has present or reasonably foreseeable future use.  This feature of the WQA poses interpretive problems: where, exactly, are these places of withdrawal?  What makes a location a "place of withdrawal?"  Where might these locations be at a site like an open pit mine?

{24}      Petitioners' contention that Section 74-6-5(E)(3) is sufficiently clear to discern its purpose and application from the words of the provision alone does not withstand scrutiny.  Their assertion that the provision merely requires a site specific evaluation of whether a discharge will contaminate groundwater with present or future use so as

12

to ensure that all groundwater with present or future use is protected oversimplifies the interpretive problem.

{25}     Petitioners are effectively arguing that the place of withdrawal language reflects a legislative intent to protect all groundwater at any location from contamination.  But it is difficult to see how this argument flows from the plain language of Section 74-6-5(E)(3).  The first sentence of the provision does state that a discharge permit shall not be issued if "the discharge would cause or contribute to water contaminant levels in excess of [the 3103 standards]."  Section 74-6-5(E)(3). If the provision said only this, then we would have to agree that its plain language precludes contamination of any groundwater, period, and we would have to agree with Petitioners' plain meaning argument.  But the provision says more.  It goes on to specify how a discharge's effect shall be measured and clarifies that it shall be measured at a place of withdrawal, and we have already determined that this additional language is significant.

{26}     When we engage in statutory interpretation, we must give effect to all of the words used in a statutory provision.  *State ex rel. Klineline v. Blackhurst*, 1988-NMSC-015, ¶ 12, 106 N.M. 732, 749 P.2d 1111.  We would not achieve that end in this case if we embraced Petitioners' reading of the statute.  Their plain-

13

language argument does not meaningfully engage the "place of withdrawal" phrase in Section 74-6-5(E)(3). This is not the only reason we doubt Petitioners' plain meaning argument. Respondents offer a plausible alternative construction of the statutory phrase that is entirely different from the construction advanced by Petitioners.

{27} Respondents assert that the most sensible reading of the requirement under Section 74-6-5(E)(3) that the effect of discharges be measured at "any place of withdrawal" is that the WQA requires installation of the very types of monitoring wells contemplated by the Copper Rule. They state the case for this reading of the provision convincingly:

> The Legislature's directive that a discharge's effect on groundwater "shall be measured" implies that groundwater will actually be brought to the surface for analysis. The normal method for bringing groundwater to the surface is a well. [Thus, t]he Legislature's directive that NMED measure groundwater quality at "any place of withdrawal" means that NMED is to select specific locations at which groundwater will be withdrawn for measurement.

Respondents contend that, by requiring extensive monitoring wells where water quality is measured to detect exceedances of 3103 standards, the Copper Rule does precisely what the plain language of Section 74-6-5(E)(3) commands.

14

{28} Respondents' alternative construction of Section 74-6-5(E)(3) establishes the validity of a conclusion the Court of Appeals reached more than a decade ago: Section 74-6-5(E)(3) is sufficiently nebulous to elicit legitimate differences of opinion concerning its meaning. *Phelps Dodge Tyrone, Inc. v. N.M. Water Quality Control Comm'n* (*Phelps Dodge*), 2006-NMCA-115, ¶¶ 27-28, 140 N.M. 464, 143 P.3d 502. Petitioners' discussion of the genesis of the phrase "any place of withdrawal of water for present or reasonably foreseeable future use" does little to clarify the obscurity we perceive within Section 74-6-5(E)(3).

{29} Petitioners contend that the phrase has, from its first appearance in the WQA in 1993, 1993 N.M. Laws, ch. 291 § 5, always been meant to "place the basic burden of proof where it belongs, on the discharger to prove that [the] discharge would not impair any other use of ground water." To support this position, Petitioners point to historical sources including past statements of officials, minutes of meetings, and correspondence or letters. These arguments are unpersuasive.

{30} "It is the policy of New Mexico courts to determine legislative intent primarily from the legislation itself." *Regents of Univ. of N.M. v. N.M. Fed'n of Teachers*, 1998-NMSC-020, ¶ 30, 125 N.M. 401, 962 P.2d 1236. "We do not attempt to divine what legislators read and heard and thought at the time they enacted a particular item

15

of legislation." *Id.* Even if we were to consider the historical sources Petitioners rely on, those sources do not explain why—if the statutory phrase has always been understood to convey a basic principle—the phrase has repeatedly confounded those called upon to interpret it, including the Commission itself. *See Phelps Dodge*, 2006-NMCA-115, ¶¶ 27-31 (describing the phrase as "one of beguiling simplicity" and observing that even the Commission has struggled to define and apply it (internal quotation marks and citation omitted)). Indeed, the Commission's position in this present appeal is that the phrase is undeniably vague and permits certain flexibility with regards to enforcing the mandates of the WQA. We have little hesitation concluding that Section 74-6-5(E)(3) is ambiguous; however, this does not mean that the core purpose of this provision is indiscernible.

*b.     The core purpose of Section 74-6-5(E)(3)*

{31}     In *Phelps Dodge*, the Court of Appeals capably articulated what we perceive to be the core purpose of the place of withdrawal language within Section 74-6-5(E)(3). "Certainly," the Court observed, "the [L]egislature meant to capture the concept that clean water that is currently being withdrawn for use, or clean water that is likely to be used in the reasonably foreseeable future, must be protected." *Phelps Dodge*, 2006-NMCA-115, ¶ 27. The Court went on to add that the

16

phrase suggests that the [L]egislature meant for impacts to be measured in a practical and sensible fashion, but the issue is complicated by the fact that groundwater and surface water systems are interconnected. Contaminated waters migrate into areas that were previously pristine. We have no doubt that the [L]egislature intended to limit that kind of migration.

*Id.* ¶ 29. We agree that these concerns lie at the heart of Section 74-6-5(E)(3) and express its core purpose.

{32} But we also agree with the Court of Appeals that such broad pronouncements of purpose tell us very little about how Section 74-6-5(E)(3) is to be applied in a specific situation like an open pit mine. *See Phelps Dodge*, 2006-NMCA-115, ¶¶ 27, 28 (observing that the Legislature's decision to utilize the statutory phrase place of withdrawal "leads to genuine uncertainty about the legislative intent for a site like [the] Tyrone [mine]" and inquiring whether water quality should "be measured at the bottom of a waste rock pile, at the bottom of the mine pit, at wells located at the perimeter boundary of the mine property, or at some other point or points"). Additionally, we agree with the Court of Appeals that recognition of Section 74-6-5(E)(3)'s broadest purposes reveals very little about how the statute might apply at a mine given the fact that our Legislature has gone so far as to describe the activity of mining as "vital to the welfare of New Mexico." NMSA 1978, § 69-36-2 (1993);

17

*Phelps Dodge*, 2006-NMCA-115, ¶ 29 ("[M]ining is a necessary and important component of our economy and our modern way of life. We believe that the [L]egislature intended that our laws, regulations, and any interpretation of them, strike a wise balance between . . . competing interests.").

{33} How should our Legislature's clear and vigorous statement about the importance of mining bear on our understanding of Section 74-6-5(E)(3)? How should the importance of mining bear on our understanding of Section 74-6-5(E)(3) when the WQA itself directs the Commission to consider the "economic value of the sources of water contaminants" when crafting regulations? Section 74-6-4(E)(2). Principles of administrative law make clear that the judiciary does not bear singular responsibility for resolving these conflicts and interpretive difficulties. Other institutional actors are allocated responsibility in this task.

*c.    Applicable administrative law principles*

{34} It is a settled principle of administrative law that the Legislature, when "through express delegation or the introduction of an interpretive gap in the statutory structure, has delegated policy-making authority to an administrative agency, the extent of judicial review of the agency's policy determinations is limited." *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696 (1991). This is because

18

> [w]hen [the Legislature] drafts a statute that does not resolve a policy dispute that later arises under the statute, some institution must resolve that dispute. The institution called upon to perform this task is not engaged in statutory interpretation. It is engaged in statutory construction. It is not resolving an issue of 'law.' Rather, it is resolving an issue of policy.

I Richard J. Pierce, Jr., *Administrative Law Treatise* § 3.3, at 160-61 (5th ed. 2010). Our case law acknowledges and embraces these principles.

{35} We "defer to an agency interpretation if the relevant statute is unclear or ambiguous," *Doña Ana Mut. Domestic Water Consumers Ass'n v. N.M. Pub. Regulation Comm'n*, 2006-NMSC-032, ¶ 10, 140 N.M. 6, 139 P.3d 166, and "will confer a heightened degree of deference to . . . special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function." *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 25, 133 N.M. 97, 61 P.3d 806 (internal quotation marks and citation omitted). We will overturn the administrative construction "of statutes by appropriate agencies *only if they are clearly incorrect*." *Bokum*, 1979-NMSC-090, ¶ 58 (internal quotation marks and citation omitted).

{36} The Commission is the appropriate policy-making entity in this context. Because we have concluded that Section 74-6-5(E)(3) is ambiguous, the question

before us is whether the Commission has permissibly construed Section 74-6-5(E)(3). Stated more specifically, we must resolve whether the Copper Rule's treatment of Section 74-6-5(E)(3) advances the core purposes of the provision. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 845 (1984) ("If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation *is not one that Congress would have sanctioned*." (emphasis added) (internal quotation marks and citation omitted)). Before we turn to that inquiry, we address Petitioners' assertion that the Commission is entitled to little or no deference in this case.

{37} Petitioners contend that the deference normally afforded to administrative agencies should not be extended to the Commission in this case because the Commission adopted *verbatim* NMED's proposed statement of reasons and, according to Petitioners, NMED's statement of reasons was "ghost written" by Freeport-McMoran, a mining company and one of the respondents in this case. Petitioners argue that the Commission effectively adopted Freeport-McMoran's statement of reasons and "appellate courts give less deference to findings of fact and

20

conclusions of law that are adopted *verbatim* from a party, especially in complex cases." These claims do not persuade us.

{38} The NMED was the constituent agency tasked with creating the Copper Rule. Section 74-6-2(K)(1). The Copper Rule is a complicated and lengthy regulatory document overflowing with technical requirements. The order and statement of reasons the Commission issued to explain its adoption of the Copper Rule is 214 pages long and explains, in detail, why the Commission embraced the varying technical standards in the Copper Rule and why certain proposed amendments to the Copper Rule were rejected. We have previously explained that an administrative entity must provide the reasons upon which it bases its decision to adopt regulations. *Bokum*, 1979-NMSC-090, ¶ 39. This information is necessary because it reveals "the reasoning of the [agency] and the basis on which it adopted the regulations." *Id.* ¶ 37 (internal quotation marks and citation omitted). The Commission's order and statement of reasons more than satisfied this requirement.

{39} It is hardly surprising that the Commission relied on the NMED when fashioning the order and statement of reasons as the NMED was responsible for the Copper Rule's development and both parties serve the citizens of New Mexico. *See* NMSA 1978, § 9-7A-6(B)(6) (1991) (stating that the secretary of the NMED shall

"conduct research and studies that will improve . . . the provision of services to the citizens of the state"); Section 74-6-4(D) (stating that the Commission shall adopt regulations to protect "public health or welfare"). The Commission's collaboration with NMED does not cause us to question or doubt the Commission's order and statement of reasons.

{40}   To the extent that Petitioners' argument is focused on and objects principally to NMED's collaboration with industry, we think it sufficient to point out that a tribunal's adoption of findings proposed by a party, even a *verbatim* adoption, is not error so long as the findings are supported by substantial evidence. *In re Hamilton*, 1981-NMSC-120, ¶ 6, 97 N.M. 111, 637 P.2d 542. This proposition has particular consequence here.

{41}   The focus of Petitioners' appeal is not the sufficiency of the evidence underlying the order and statement of reasons. Indeed, the Court of Appeals, in its opinion below, declined to address Petitioners' sufficiency of the evidence arguments because they were not properly presented. *See Gila Res. Info. Project*, 2015-NMCA-076, ¶ 56 ("[Petitioners'] decisions to omit citations to the evidence in the record that supported the agency's decision and to present the evidence in the light most favorable to itself leaves to this Court the task of digging through the voluminous

22

record to determine whether, on balance, the evidence fails to support the [Commission's] finding[s]. This we will not do." (second and third alterations in original) (internal quotation marks and citation omitted)). Rather, Petitioners' arguments in this appeal are focused on the lawfulness of the Copper Rule. Thus, we need only focus on whether the Commission's decision to adopt the Copper Rule was lawful.

{42} To the extent our inquiry of the lawfulness of the Copper Rule requires considerations of evidentiary matters, "this Court reviews the whole record to see if the agency decision is supported by substantial evidence." *AA Oilfield Serv., Inc. v. N.M. State Corp. Comm'n*, 1994-NMSC-085, ¶ 2, 118 N.M. 273, 881 P.2d 18. "We will uphold the agency decision so long as the evidence in the record satisfies us that the agency decision is reasonable." *Id.*

d.    *The Commission's construction of Section 74-6-5(E)(3)*

{43} To understand the Commission's construction of Section 74-6-5(E)(3), it is necessary to understand the regulatory strategy underlying the Copper Rule. The record supports Respondents' contention that open pit copper mining leads inevitably to some degree of contaminant discharge. The Copper Rule acknowledges this reality and operates from the premise that the most effective way to mitigate these inevitable

discharges is through containment. Thus, 3103 standards may be exceeded within the area of open pit hydrologic containment not, as Petitioners contend, because the Copper Rule invites pollution there, but because the Copper Rule accepts that some discharge contamination is inevitable, seeks to contain that contamination, and relies on the hydrologic phenomenon produced by the open pit to contain it. This justification for the waiver is supported by evidence in the record and by provisions within the Copper Rule.

{44} One of Respondents' experts offered the following explanation for why the Copper Rule waives the 3103 standards in the area of open pit hydrologic containment:

> The reason for this [waiver] is evident from the definition of the area of hydrologic containment and the exhibits. Ground water within the area of hydrologic containment, whether impacted by mine operations or not, will flow to, and be extracted at, the pit. The disposition of this ground water, therefore, is known, and it will be utilized and managed in accordance with an NMED approved water management plan. Water extracted at open pits is most commonly utilized as part of the mine operational water requirements, such as replenishment of the leach circuit.

Another of Respondents' experts stated that "complete effective hydrologic control" can be achieved in the open pit surface drainage area and, consequently, it is preferable to locate mine units in this area because "there is excellent containment to

24

protect surrounding ground water." Evidence presented to the Commission indicated that storm water will be diverted away from the open pit and groundwater underlying or adjacent to the pit will drain to the pit and will be removed by evaporation or pumping. The Copper Rule provides that the monitoring well system must be placed "as close as practicable" to the open pit, 20.6.7.28(B) NMAC, and that "[w]ater generated from within the perimeter of the open pit and pit dewatering activities shall be managed according to a mine operation water management plan." 20.6.7.24(C) NMAC.

{45}     When properly considered, the Copper Rule's waiver of 3103 standards in the area of open pit hydrologic containment reflects policy preferences and strategic choices designed to mitigate the environmental harms inherent in open pit copper mining. The waiver provision in no way invites industry to contaminate freely in that area. This strategic containment approach is also reflected in the way the Copper Rule treats the "place of withdrawal" language in Section 74-6-5(E)(3).

{46}     The Copper Rule makes no express delineation regarding which areas at a mine facility are places of withdrawal and which are not. Respondents contend that the regulatory structure embraced by the Copper Rule makes certain essential assumptions about this subject. We agree.

{47} The Copper Rule requires "detailed unit-by-unit ground water monitoring" utilizing monitoring wells that must be placed as close as practicable to the open pit and also as close as practicable to mining units regardless of whether those units are located within the open pit surface drainage area or not. *See* 20.6.7.28(B)(2), (B)(4)-(6) NMAC. The Copper Rule, Respondents claim, excludes the area of open pit hydrologic containment and areas inside the perimeter of the required monitoring well system as places of withdrawal. Conversely, the Copper Rule treats areas outside these locations as places of withdrawal. Respondents claim that there are legitimate and sensible reasons for this arrangement, all of which were presented to and considered by the Commission.

{48} First, the open pit is not a place of withdrawal because, as already discussed, it functions as one of the principal containment tools and as a barrier beyond which contamination produced from mine units within the open pit surface drainage area or the open pit itself cannot migrate.

{49} Second, the Copper Rule functions on a unit-by-unit basis and ensures groundwater protection at each unit through discharge control and monitoring at the monitoring well network. NMED must approve the monitoring well locations for each copper mine unit and may require additional wells to ensure that the monitoring

26

system is sufficiently comprehensive. 20.6.7.28 NMAC. According to the Commission, these requirements pertaining to NMED's oversight of the monitoring well system are the most intensive required by any state.

{50} Third, copper mining involves significant amounts of water to process ore. Waters inside the monitoring well system are used for mining activities during active mining operations.

{51} Fourth, it is inconceivable that anyone would attempt or desire to access groundwater from the bottom of an open pit or from areas underlying active mining units. Similarly, it would be contrary to common sense to treat units that must be lined as places of withdrawal as it would be necessary to breach the lining to access the groundwater.

{52} Fifth, the Copper Rule presumes that the Legislature did not intend the WQA to preclude *any* degradation of *any* groundwater at *every* location at an open pit copper mine. If this were not true, open pit copper mining would not be lawful in New Mexico as there is no legitimate dispute that open pit mining necessarily causes some degradation of surface and groundwater. The validity of this presumption was recognized more than a decade ago. In *Phelps Dodge*, the Court of Appeals explained that, although water might be withdrawn from a variety of locations on a

27

mine site, "it would be incorrect to conclude that, as a consequence, the entire mine is a measuring point . . . ." 2006-NMCA-115, ¶ 33. It cannot be, the Court reasoned, that water quality standards must be met "everywhere" on a mine site. *Id.* To conclude otherwise, the Court emphasized, would be to embrace an overbroad and unrealistic standard as it is not feasible "to require all water at [a] mine site to meet drinkable water standards." *Id.*

{53}     Sixth and lastly, the Copper Rule's post-closure groundwater protection system will limit "discharge from the closed mine facilities to rates that protect ground water of the state for potential future use as domestic and agriculture water supply and surface water recharge." A copper mine operator must submit a closure water management and treatment plan that "shall include an analysis of the expected operational life of each long-term water management or water treatment system . . . until each system is no longer needed to protect ground water quality and applicable standards are met." 20.6.7.33(H) NMAC; 20.6.7.7(B)(3) NMAC ("'Applicable standards' means the standards set forth in 20.6.2.3103 NMAC[.]"). According to the Commission, this means that "[a]ll ground water—even that within the area circumscribed by the monitoring wells (with the exception of an area of an open pit for which hydrologic containment has been achieved)—must be abated to

28

3103 standards." Freeport-McMoran adds that "[g]roundwater monitoring is required for many years after mine closure, and will not cease until sufficient time has passed to measure the performance of the closure methods and monitoring shows that ground water satisfies 3103 standards." *See* 20.6.7.35(A), (C)(5) NMAC (stating post-closure requirements).

{54}     This evidence persuades us that the Copper Rule makes permissible assumptions about the statutory phrase "place of withdrawal" and where these places exist at open pit copper mine facilities. It makes these assumptions not to permit pollution but to advance a comprehensive containment strategy. The Copper Rule's presumption that the area of open pit hydrological containment and areas inside the monitoring well network are not places of withdrawal is not predicated on a clearly incorrect reading of the place of withdrawal language of Section 74-6-5(E)(3). To the contrary, these exclusions and the design of the Copper Rule more generally advance the core purpose of Section 74-6-5(E)(3) by protecting groundwater outside the area of open pit hydrologic containment and monitoring wells. One additional point assures us of the correctness of our conclusion that the Copper Rule advances the core purpose of the statute.

29

{55}    The Copper Rule's exclusion of certain areas as places of withdrawal does not grant the copper industry license to freely contaminate groundwater inside the monitoring well network system.  Various provisions within the Copper Rule are intended to ensure that this will not occur.

*e.      Copper Rule provisions applicable to areas excluded as places of withdrawal*

{56}    All waste rock shall be evaluated for its potential to release contaminants in excess of the 3103 standards.  20.6.7.21(A)(1) NMAC.  Testing of waste rock will take various forms consistent with best practices and will "identify whether waste rock may generate acid or release regulated ground water contaminants when placed in a stockpile."  Expert testimony indicated that "the containment approach to waste rock stockpiles under the [Copper] Rule" is more "protective" than the approaches used in Arizona and Nevada.

{57}    Units *outside* the open pit surface drainage area are subject to stringent requirements.  Leach stockpiles outside the open pit surface drainage area "shall be placed on an engineered liner" and must incorporate leach solution collection and containment systems.  20.6.7.20(A)(1)(a)-(e) NMAC.  According to the Commission, lined leach stockpiles will not contaminate groundwater above 3103 standards.  Waste rock stockpiles outside the open pit surface drainage area shall be designed and

30

engineered to capture, contain, or divert storm water and seepage and to capture or contain "[g]round water impacted by waste rock stockpiles" through an interceptor system. 20.6.7.21(B)(1)(a)-(e) NMAC. Testimony was submitted that these regulatory protections are consistent with and more specific than regulations in other copper-producing states. Crushing and milling units outside the open pit surface drainage area "shall be designed to contain and manage all materials containing water contaminants that have the potential to migrate to ground water and cause an exceedance of applicable standards on concrete or low permeability surfaces . . . ." 20.6.7.22(A)(1) NMAC.

{58} Units *inside* the open pit surface drainage area are subject to lesser requirements, but are still subject to regulation. Leach stockpiles inside the open pit surface drainage area may be alternatively designed and need not be placed on an engineered liner "provided that the stockpile and solution capture systems are designed to maximize leach solution capture considering the site-specific conditions of the open pit, underlying geology and hydrology, and leach solutions will not migrate outside of the open pit surface drainage area." 20.6.7.20(A)(1)(f) NMAC. Stormwater run-on at any waste rock stockpile located inside the open pit surface

31

drainage area must "be diverted or contained to minimize contact between stormwater run-on and the stockpiled material." 20.6.7.21(B)(2) NMAC.

{59} Other units are subject to requirements that apply regardless of where the units are located. The requirements for new tailings impoundments make no distinction whether the impoundment is outside or inside the surface drainage area. At new tailings impoundments,

> [s]tormwater run-on shall be diverted and/or contained to minimize contact between stormwater run-on and the tailing material[,] . . . [s]eepage from the sides of a tailing impoundment shall be captured and contained[,] . . . and [g]round water impacted by the tailing impoundment in excess of applicable standards shall be captured and contained through the construction of interceptor systems . . . .

20.6.7.22(A)(4)(a)-(c) NMAC. The permit applicant must submit a design report demonstrating that the "interceptor system design will capture ground water impacted by the tailings impoundment such that applicable standards will not be exceeded at monitoring well locations . . . ." 20.6.7.22(A)(4)(d)(viii) NMAC. The Commission found that "an interceptor well system can be successfully designed and operated to contain drainage from an unlined tailings impoundment, when necessary, during and after operation."

32

{60} If "monitoring of a water contaminant source indicates that applicable standards are exceeded," then the Copper Rule imposes varying contingency requirements. 20.6.7.30 NMAC. The Commission found that "contingencies in each case comprise some or all of the following actions: notify, confirm, repair, correct, and abate."

{61} The Copper Rule's waiver of standards within the area of open pit hydrologic containment and its exclusion of certain areas as places of withdrawal does not negate or otherwise eliminate the existence or effect of the provisions summarized above. We cannot conclude that the Copper Rule violates the WQA because it purportedly permits rather than prevents contamination when the Copper Rule's plain terms contain an abundance of provisions that afford significant groundwater protections at copper mine facilities designed to prevent pollution.

f.      *Conclusion: Section 74-6-5(E)(3) and "place of withdrawal"*

{62} This Court is not competent to judge what is the most effective and efficient way to combat the adverse consequences of open pit copper mining. Our task in this case is limited to assessing whether the Copper Rule violates the WQA. The inclusion of the "place of withdrawal" language in Section 74-6-5(E)(3) suggests not, as Petitioners insist, that the WQA clearly and plainly forbids the containment

33

strategy the Commission implemented through the Copper Rule. Rather, this uncertain language provides flexibility within which the Commission is free to implement the policies it deems most prudent. The Commission is limited only to the extent that its construction of Section 74-6-5(E)(3) must serve this provision's core purposes which we can discern from the otherwise ambiguous language of the provision. For the reasons stated, we conclude that the Copper Rule is premised on a permissible construction of Section Section 74-6-5(E)(3).

**2.      The WQA's Variance Provision**

{63}      Petitioners point out that Section 74-6-4(H) of the WQA instructs that the Commission "may grant an individual variance from any regulation of the commission whenever it is found that compliance with the regulation will impose an unreasonable burden upon any lawful business, occupation or activity[,]" and argue that the Copper Rule "circumvents [this provision] because it permits widespread ground water pollution above 3103 standards at all copper mines without a variance." We have rejected Petitioners' assertion that the Copper Rule permits widespread pollution above 3103 standards at open pit copper mine facilities. Thus, Petitioners' assertion that the Copper Rule violates the variance provision of the WQA is fatally flawed.

34

## 3. Point of Compliance

{64} Petitioners contend that the Copper Rule functions as a "point of compliance" system and that the Legislature did not authorize the Commission to embrace this type of regulatory framework. The Court of Appeals sufficiently addressed this argument in the opinion below. *Gila Res. Info. Project*, 2015-NMCA-076, ¶¶ 27-28. We quote a passage from that opinion as it adequately responds to Petitioners' argument: "Assuming that the [Copper Rule] created a system that is properly characterized as a point-of-compliance system, nothing in the WQA prohibited the Commission from doing so." *Id.* ¶ 28.

## 4. The Commission's Prior Regulatory Practice

{65} Petitioners argue that the Copper Rule is invalid because it is a departure from past Commission practice. They also contend that the 2009 Amendments to the WQA implicitly approved a factor-based approach to "determining places of withdrawal." We reject both claims.

{66} The Legislature gave the Commission no guidance in 2009 as to what form or substance the regulations to manage discharges in the copper industry should take. We decline to read the Legislature's silence as embracing (implicitly or otherwise) any particular approach to determining places of withdrawal or, more broadly, to

35

discharge management in the copper mining industry. *See State ex rel. Barela v. N.M. State Bd. of Educ.*, 1969-NMSC-038, ¶ 7, 80 N.M. 220, 453 P.2d 583 ("We are not permitted to read into a statute language which is not there . . . ."); *Gonzales v. Oil, Chem. & Atomic Workers Int'l Union*, 1966-NMSC-211, ¶ 28, 77 N.M. 61, 419 P.2d 257 ("The statute is to be read and given effect as written."). Rather, we construe that silence as a broad conferral of authority to the Commission allowing it to pursue the policies and regulatory approaches it deemed most wise.

{67} To the extent the Copper Rule is a departure from past Commission practice, the law makes clear that the Commission is not constrained by its prior practices. "An agency is always free to change its policy, as long as it announces a policy that is within the range permitted by [the Legislature], uses a procedure [the Legislature] has authorized it to use to make binding policy decisions, and explains the reasons for its change in policy." I Pierce, *supra*, § 3.3, at 165.

{68} We have already determined that the Copper Rule is a permissible policy, and there is no question that the rulemaking proceedings that led to the adoption of the Copper Rule were open and transparent. Petitioners contend that the procedures used here were "not in accordance with law because *no notice* was given to parties or the

public that reversal of the [*Phelps Dodge* d]ecision was within the scope of the rulemaking[.]" We reject this claim.

{69} The Legislature's decision to grant the Commission broad discretionary authority—to fashion whatever regulations the Commission thought best—put Petitioners on notice that a new approach to regulating discharges at copper mines was possible. Our review of the record reveals that Petitioners knew a new approach was indeed under consideration.

{70} Petitioners moved to admit the record proper in the *Phelps Dodge* remand proceedings into the administrative record in the Copper Rule rulemaking proceedings. They did this because they objected to the fact that the Copper Rule was inconsistent with the factor-based approach embraced by the Commission after the remand following the issuance of *Phelps Dodge*. This evidence shows that Petitioners knew that the Commission was considering a course different than that reached on remand following *Phelps Dodge*. Accordingly, Petitioners cannot argue that they lacked notice that the Commission was considering this course of action.

## 5.     The Copper Rule's Closure Provisions

{71}     Petitioners object to the closure provisions of the Copper Rule. They contend that these provisions allow "extensive ground water pollution above 3103 Standards, in perpetuity[.]" Petitioners misstate what the Copper Rule allows.

{72}     The Commission found that "[p]ost-closure protection of ground water is achieved by making the closed open pit a ground water sink, either by evaporation or by pumping." The Commission heard evidence and was persuaded that "[t]his protection will be effective." Accordingly, the Copper Rule allows 3103 standards to be exceeded only at a closed open pit mine that is a hydrological evaporative sink, i.e., where evaporation exceeds water inflow. 20.6.7.33(D)(1) NMAC. In this circumstance, the contaminated water will evaporate over time. By definition, this is not "in perpetuity." Moreover, 20.6.7.33(D)(1) NMAC expressly limits the types of exceedances permitted in a closed open pit that is a hydrological evaporative sink. And lastly and as already noted, the Commission's position is that, at closure, all groundwater at a mine site—with the exception of groundwater at an open pit that is a hydrologic evaporative sink—must be abated to 3103 standards. We reject Petitioners' arguments concerning the Copper Rule's closure provisions.

38

## III.     CONCLUSION

{73}     Petitioners have not established that the Copper Rule is inconsistent with the WQA or otherwise clearly incorrect.  Nor have they established that there are no conceivable set of facts under which the Copper Rule might be valid.  We affirm the Commission's decision to adopt the Copper Rule.

{74}     **IT IS SO ORDERED.**

_____
**JUDITH K. NAKAMURA, Chief Justice**

39

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**

_____
**BARBARA J. VIGIL, Justice**

40