# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:** _____

**Filing Date: September 18, 2017**

**NO. S-1-SC-36169**

**ALBUQUERQUE CAB COMPANY, INC.,**

Appellant,

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION,**

Appellee,

and

**Q CAB, LLC,**

Intervener-Appellee,

**CONSOLIDATED WITH**

**NO. S-1-SC-36174**

**YELLOW-CHECKER CAB COMPANY, INC.,**

Appellant,

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION,**

Appellee,

and

**Q CAB, LLC,**

Intervener-Appellee.

**APPEAL FROM THE NEW MEXICO PUBLIC REGULATION COMMISSION**

Cadigan Law Firm, P.C.
Michael J. Cadigan
Albuquerque, NM

for Appellant Albuquerque Cab Company, Inc.

Sanchez, Mowrer & Desiderio, P.C.
Armand Damacio Huertaz
Raymond G. Sanchez
Albuquerque, NM

for Appellant Yellow-Checker Cab Company, Inc.

Judith Ellen Amer
Santa Fe, NM

for Appellee

Jason Marks Law, LLC
Jason A. Marks

Albuquerque, NM

for Intervener

**OPINION**

**DANIELS, Justice.**

{1}    This is a direct appeal from a final order of the New Mexico Public Regulation Commission (PRC) granting a taxicab certificate to Q Cab for a new taxicab service in Albuquerque. This Court consolidated two separate appeals of that order by two preexisting Bernalillo County taxicab companies, Albuquerque Cab Company (Albuquerque Cab) and Yellow-Checker Cab Company (Yellow Cab).

{2}    This case came before the PRC under recently amended portions of the Motor Carrier Act, NMSA 1978, § 65-2A-1 to -41 (2003, as amended through 2017). The 2013 amendments created separate designations for "municipal" and "general" taxicab services, *see* § 65-2A-3(T)(3), (U)(2) (2013), and added a definition of fitness, Section 65-2A-3(R) (2013), which a candidate taxicab company must show and the PRC must find before an applicant may operate, *see* § 65-2A-8(B)(1). The parties ask this Court to interpret the Motor Carrier Act with respect to both the parameters of fitness and the privileges and responsibilities of existing municipal taxicabs when they protest new taxicab applications.

**I.    BACKGROUND**

{3}    On December 28, 2015, Q Cab, LLC applied to the PRC for a certificate to provide general taxicab services on a small scale within Bernalillo County. On

January 13, 2016, Yellow Cab filed a protest and motion to intervene. Yellow Cab is a municipal taxicab company operating in Bernalillo and Sandoval counties. On January 19, 2016, Albuquerque Cab filed a protest of and objection to Q Cab's application. Albuquerque Cab is also a municipal taxicab company operating in Albuquerque and surrounding areas. Both protesting companies had territories that overlapped with the territory Q Cab had proposed for its operation.

{4}     The PRC designated a hearing examiner to consider Q Cab's application along with the protests and to draft a recommended decision for the PRC. The hearing examiner conducted a public hearing on May 9 and 10, 2016. On August 15, 2016, the hearing examiner recommended that the PRC reject arguments of Albuquerque Cab and Yellow Cab that they are municipal taxicab companies statutorily protected against Q Cab's entry into the market. The hearing examiner also found that Q Cab was not fit and able to provide general taxicab service and that granting its application would be contrary to the public interest. The hearing examiner recommended that the PRC deny Q Cab's application. On August 29, 2016, Albuquerque Cab and Yellow Cab each filed exceptions to the recommended decision relating to their protected status, and Q Cab and PRC Transportation Division staff filed joint exceptions relating to the issue of Q Cab's fitness. On October 5, 2016, the

PRC voted to adopt the recommendation of the hearing examiner denying Albuquerque Cab and Yellow Cab the claimed statutory protection and to adopt the joint exceptions filed by Q Cab and PRC Transportation Division staff and thereby reject the recommended finding that Q Cab was unfit to operate. The PRC approved Q Cab's application.

{5} Additional facts are set forth below as they pertain to each issue.

**II. DISCUSSION**

**A. Jurisdiction and Standard of Review**

{6} The New Mexico Supreme Court has jurisdiction over this appeal pursuant to Section 65-2A-35(A) and Rule 12-102(A)(2) NMRA of the Rules of Appellate Procedure.

{7} In reviewing orders of the PRC, the Supreme Court must determine whether the PRC decision is "arbitrary and capricious, not supported by substantial evidence, outside the scope of the agency's authority, or otherwise inconsistent with law." *Att'y Gen. of N.M. v. N.M. Pub. Regulation Comm'n*, 2011-NMSC-034, ¶ 9, 150 N.M. 174, 258 P.3d 453; *see* § 65-2A-35(C).

{8} "'[A]n agency's action is arbitrary and capricious if it provides no rational connection between the facts found and the choices made, or entirely omits

3

consideration of relevant factors or important aspects of the problem at hand.'" *Colonias Dev. Council v. Rhino Envtl. Servs. Inc.*, 2005-NMSC-024, ¶ 41, 138 N.M. 133, 117 P.3d 939 (alteration in original) (citation omitted). "An agency abuses its discretion when its decision is not in accord with legal procedure or supported by its findings, or when the evidence does not support its findings." *Oil Transp. Co. v. N.M. State Corp. Comm'n*, 1990-NMSC-072, ¶ 25, 110 N.M. 568, 798 P.2d 169. "[S]ubstantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Toltec Int'l, Inc. v. Village of Ruidoso*, 1980-NMSC-115, ¶ 3, 95 N.M. 82, 619 P.2d 186, "'and we neither reweigh the evidence nor replace the fact finder's conclusions with our own,'" *Albuquerque Bernalillo Cty. Water Util. Auth. v. N.M. Pub. Regulation Comm'n*, 2010-NMSC-013, ¶ 18, 148 N.M. 21, 229 P.3d 494 (citation omitted).

{9}     When a final order turns on an agency's determination of matters within its special expertise, this Court gives heightened deference to the agency's determination. *See Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 904 P.2d 28. However, "we apply a de novo standard of review to the PRC's rulings regarding statutory construction." *Albuquerque Bernalillo Cty. Water Util. Auth.*, 2010-NMSC-013, ¶ 50. We read

related statutes in harmony and give effect to all provisions. *El Paso Elec. Co. v. N.M. Pub. Regulation Comm'n*, 2010-NMSC-048, ¶ 7, 149 N.M. 174, 246 P.3d 443.

**B.      Albuquerque Cab and Yellow Cab Are Not Statutorily Protected from Competing Applicants**

{10}      As providers of municipal taxicab services, Albuquerque Cab and Yellow Cab hold certificates under the amended Motor Carrier Act, issued by the PRC soon after the 2013 amendments took effect. They argue that these certificates protect them from Q Cab's entry into their full-service territories under Section 65-2A-13(D)(2), which specifies that the PRC "shall not grant an application . . . for a new certificate for general taxicab service within the full-service territory of a protesting municipal taxicab service carrier."

{11}      General and municipal taxicab companies are regulated differently. A municipal taxicab service is one

> that deploys vehicles at all times of the day and year, is centrally dispatched and reasonably responds to all calls for service within its endorsed full-service territory regardless of profitability of the individual trip, in addition to the transportation service provided by a general taxicab service.

Section 65-2A-3(GGG)(1) (2013). A general taxicab service is one

> that need not be dispatched, that may pick up on-demand passengers through flagging or at a taxicab stand or queue, that need not deploy vehicles in any particular manner and that may charge for trips to

destination points or places outside of the taxicab service's certificated territories on the basis of a set fare.

Section 65-2A-3(GGG)(2) (2013).

{12}    The version of 18.3.2.9 NMAC in effect in October 2016 when the PRC issued the Final Order specified that both municipal taxicab services and general taxicab services

   (1)    may not provide ambulance service, scheduled or general shuttle service, specialized passenger service, or household goods service;
   (2)    shall charge rates based on one charge for the first person and an additional small fixed charge for each additional person;
   (3)    shall grant exclusive direction to the first person engaging the taxicab service;
   (4)    may provide one-way transportation of passengers;
   (5)    may solicit business on the streets or may prearrange to provide service; [and]
   (6)    may not use chauffeur-driven luxury motor vehicles to provide taxicab service.

18.3.2.9(G), (H) NMAC (02/13/2015). And these regulations imposed the additional requirements that municipal taxicab services

   (7)    must respond to 95% of all pre-arranged calls for service within eight minutes of the time agreed upon for the taxicab to be at the customer's location;
   (8)    must respond to 85% of all calls for immediate service within 30 minutes of receiving the request for service; and
   (9)    except for hailed or for pre-arranged service (hereby defined as "any call requesting service made 30 minutes or longer before service is required" may only respond to calls for service that are dispatched by the taxicab service; in determining if the requirements of Paragraphs (7)

6

and (8) above are met, the commission may examine a municipal taxicab service's response times based on six-month rolling average.

18.3.2.9(G) NMAC (02/13/2015).

{13}     Albuquerque Cab and Yellow Cab view these additional regulatory requirements as one side of a trade-off where, "[i]n exchange for operating under these extra burdens, the PRC is obligated to ensure that full-service providers have the ability to perform at optimal levels and are not impaired or damaged by unfit or unnecessary additional providers being allowed into the market." Albuquerque Cab argues that it has not been adequately protected from competition and that this case follows a trend wherein the PRC has been "stretching, bending, and in some cases, breaking the Motor Carrier Act in the interest of free enterprise and allowing new companies into the market without regard for the Act."

{14}     But Q Cab argues, the hearing examiner determined, and the PRC concluded that the protection is not automatic and that Albuquerque Cab and Yellow Cab both failed to meet their obligation under Section 65-2A-13(C)(2) that "a protesting carrier has the burden of proving all matters of fact pertaining to its full-service operation within its certificated full-service territory."

{15}     We agree with Q Cab. Reading Sections 65-2A-13(D)(2) and 65-2A-13(C)(2) in harmony means that protestants (1) must be PRC-certified providers of municipal

7

taxicab service for the relevant full-service territory under Subsection (D)(2) and (2) must prove "all matters of fact pertaining to [their] full-service operation within [the] certificated full-service territory" under Subsection (C)(2).

{16}     Although they maintain that their certificates automatically protect them under Section 65-2A-13(D)(2), Albuquerque Cab and Yellow Cab did provide some evidence below about their provision of full-service taxicab operations within their territories. Albuquerque Cab testified that its dispatchers record the time of a call and that drivers record the time of the pickup in response to the call. Administrative staff members review the drivers' "trip sheets" after each day's activity and compare them to the dispatchers' records of when calls were received. Albuquerque Cab testified that it is periodically audited by Bernalillo County and the City of Albuquerque through contract programs to determine whether it meets prescribed response times. The company claims to have complied with regulations based on not having received an auditor's "letter [of] findings in several years." But Albuquerque Cab presented no audit results during the administrative proceedings, nor could it confirm that recent audits had evaluated response times for relevant calls within any time period pertinent to the proceedings. Yellow Cab offered a printout of response times for approximately two hundred calls on February 1, 2016, and argued that this set of calls

demonstrated its regulatory compliance. The hearing examiner was unimpressed, calling the submission "flawed raw data . . . from one day that contained no analysis."

{17} We hold that Section 65-2A-13(D)(2) does not automatically protect municipal taxicab companies from new entrants and that Section 65-2A-13(C)(2) requires protesting municipal taxicab companies to demonstrate that they are providing full-service taxicab operation within their certificated territories. Albuquerque Cab and Yellow Cab did not meet their statutory burden of proof, and we affirm the PRC on this issue.

{18} On a related point specific to this case, the PRC order for its Transportation Division staff to reissue municipal taxicab certificates to operating carriers as of the July 1 effective date of the 2013 amendments required that any carrier with a reissued certificate "bears the burden of proving that it provides adequate service in any case involving an application for a new authority." NMPRC Case No. 13-00209-TRM, June 26, 2013, PRC *Order on Staff's Petition* at 6-7; *see also* § 65-2A-3(M)(1) (2013) (requiring, "for full-service carriers, reasonably continuous availability . . . of transportation services . . . which are reasonably adequate to serve the entire full-service territory authorized in the certificate"). Albuquerque Cab and Yellow Cab were among those original certificate holders, and at the time of these proceedings

9

neither company had yet borne its burden of proof. Both companies were on notice that they must prove their full-service operations, which both companies failed to do below.

**C.   Albuquerque Cab and Yellow Cab Both Failed to Demonstrate Impairment**

{19}   Although Albuquerque Cab and Yellow Cab did not sufficiently prove "all matters of fact pertaining to [their] full-service operation," § 65-2A-13(C)(2), this Court could still reverse the Final Order if the PRC should have found that Albuquerque Cab and Yellow Cab demonstrated Q Cab's entrance into their territories would impair passenger service. Section 65-2A-13(D)(3) provides that the PRC shall not approve a taxicab application if doing so "presents a reasonable potential to impair, diminish or otherwise adversely affect the existing provision of full-service passenger service to the public in the full-service territory or if the application is otherwise contrary to the public interest in the full-service territory." The provision further specifies that "[d]iversion of revenue or traffic from an existing motor carrier shall not . . . be sufficient grounds for denying the application without a showing that the diversion presents a reasonable potential to affect the provision of full-service passenger service to the community," *id.*, qualifying the statutory intent as not for protecting municipal taxicab business interests but for assuring the

10

availability of transportation to the public. The PRC must conduct hearings on any protests to applications, *see* § 65-2A-13(B), during which a protesting carrier has "the burden of proving the potential impairment or adverse impact on its existing full-service operation," § 65-2A-13(C)(2), and for which "all parties . . . may base their demonstration and proof on business data, experienced persons and mathematical calculations," § 65-2A-13(C)(4).

{20} Applicant Fitsum Tesfa, Q Cab founder and owner, was the only driver at the time of the Q Cab application. Tesfa testified that Q Cab consisted of one vehicle ready to operate, a 2003 Lincoln Town Car. Q Cab intended to put a second and a third vehicle into operation, both not ready at the time of the application, and eventually to add a fourth. Throughout these proceedings, the position of Albuquerque Cab and Yellow Cab was that they had already experienced impairment of profits by the emergence of ride-share businesses like Uber and Lyft and could not withstand the addition of "even a very small competitor."

{21} Albuquerque Cab testified below that it had dropped from sixty-five to forty-five drivers between 2014 and 2016, that it had experienced a 20 percent drop in revenue between 2013 and 2015, and that the company was essentially "'operating in the red.'" Albuquerque Cab reported a drop in gross income of approximately 33

percent between 2008 and 2015, including a 17 percent drop between 2014 and 2015. Yellow Cab reported below that "in the last couple of years" it decreased the number of operating taxicabs from sixty-five to fifty-five in 2015 and "took 12 more off the road" in 2016. In 2014, Yellow Cab had approximately 14,000 calls per month, but calls dropped to about 13,000 per month in 2015. In March 2016 Yellow Cab reported a 24 percent decline in gross revenue in the previous five years, including losses of $10,000 for 2014-15 and $125,000 for 2015-16.

{22}     Albuquerque Cab and Yellow Cab testified that if Q Cab were allowed to enter the market, their business could be crippled.[1] The accountant for Yellow Cab testified, in response to a hypothetical question, that if Yellow Cab faced a loss of 5 to 10 percent of its existing call volume to another competitor, the company "would lose additional drivers and would soon reach the point where they would have to close their doors as there would not be enough revenues to cover the fixed costs of doing business." A PRC Transportation Division staff economist disputed that statement, noting that no financial statements supported the reported revenue losses

---

[1]Albuquerque Cab has since exited the market and filed for a voluntary suspension of its certificate. On April 20, 2017, in response to an application stating that "Albuquerque Cab, in its current form, cannot continue to operate as a municipal taxi service with the attendant regulatory requirements which demand significant dedication of revenue," the PRC Transportation Division granted the requested one-year suspension.

and testifying that, despite the declining revenues, "Yellow Checker Cab Company still show[s] a gross profit of 21 percent as of March 2016."

{23} Albuquerque Cab and Yellow Cab argue in this Court that their misfortunes are further compounded by the service they must provide, "regardless of profitability of any individual trip," by virtue of their designations as municipal taxicab companies, while a general taxicab company like Q Cab "will be able to cherry pick profitable rides, leaving municipal taxis to take the unprofitable ones." But Q Cab observed that the cab companies offered no particularized evidence that Q Cab's entry into the market would affect service, noting that both Albuquerque Cab and Yellow Cab "testified that they provided high quality levels of service, despite the pressures of competition from . . . companies . . . like Uber" and stating for example that "Albuquerque Cab presented . . . evidence of business pressures accruing from . . . competition to-date, but did not introduce evidence that Q Cab's entry would cause it to go out of business or stop providing full service."

{24} The hearing examiner ultimately determined that "there was not sufficient credible evidence that the entry of this Applicant taxicab would reasonably lead to the Protestors' current service to the public being discontinued or adversely [a]ffected in any way" and recommended a finding that Albuquerque Cab and Yellow Cab had

13

failed to demonstrate impairment under 65-2A-13(D)(3). The PRC adopted this recommendation.

{25} We uphold the PRC determination on this point. The protests against the Q Cab application amounted to the distress of Albuquerque Cab and Yellow Cab about then-existing competition and their speculation about the effect of the entry of Q Cab. Neither Albuquerque Cab nor Yellow Cab provided evidence that allowing Q Cab to operate would cause actual impairment of either their businesses or the passenger service within their territories.

**D.      The PRC Determination That Q Cab Is Fit to Operate Is Supported by Substantial Evidence and Is Within Its Discretion**

{26} Section 65-2A-8(B) specifies in relevant part that "the commission shall issue a certificate . . . if: (1) the applicant is fit and able to provide the transportation service to be authorized by the certificate" and "(2) the applicant is in compliance with the safety and financial responsibility requirements of the Motor Carrier Act, the rules of the commission and other applicable federal and state laws and rules." The Motor Carrier Act qualifies an applicant as fit to provide transportation service if the "applicant . . . complies with state law as provided in the Motor Carrier Act or by rule of the commission." Section 65-2A-3(R) (2013). This Court in *Bernalillo Cty. Health Care Corp. v. N.M. Pub. Regulation Comm'n*, 2014-NMSC-008, ¶¶ 24-25, 319 P.3d

1284, overturned a PRC-approved ambulance certificate as arbitrary and capricious because of a litany of noncompliant practices by the applicant who

> failed to pay its gross receipt taxes, failed to comply with [a state motor carrier regulation] (requiring a "notarized oath of the applicant attesting that all statements in the application are true and correct") by providing false statements regarding its balance sheets, and failed to have a consultant pharmacist as required by [the state licensing regulation]. Evidence was presented that [the applicant] had been billing at rates other than its tariff rate for scheduled transports in violation of Section 65-2A-20(C) [(2003)]. . . . [P]ast violations included: operating without an appropriate authority from the Commission, for which it received a $1,000 fine[, and] responding to emergencies with only one EMT in violation of [a state motor carrier regulation that] requires a minimum of two EMTs.

*Bernalillo Cty. Health Care*, 2014-NMSC-008, ¶ 24.

{27} This Court viewed these offenses as "material violations of laws and regulations directly bearing on a company's financial integrity" and therefore pertinent under Section 65-2A-8(B)(2) (2003). *Bernalillo Cty. Health Care*, 2014-NMSC-008, ¶ 25. But we cautioned that, "it would be unreasonable to conclude that the Legislature intended that an applicant be denied a certificate for violating *any* statute or rule." *Id.*

{28} Albuquerque Cab and Yellow Cab argue for a broad reading of the definition of fitness in Section 65-2A-3(R) (2013) to include not only violations of law but also generally misleading behavior that they allege occurred here. A chief complaint of

15

Albuquerque Cab and Yellow Cab centers on photographs Tesfa posted on a Facebook page for his business before it was certified. The photos showed the car that he planned to use for Q Cab taxicab service, adorned with signage indicating the name of his business, a made-up PRC permit number, and logos for credit card companies. Albuquerque Cab and Yellow Cab analogize to *Bernalillo Cty. Health Care*. Albuquerque Cab argues that the premature signage amounted to a "rather explosive finding of fraud."

{29}     Counsel for Albuquerque Cab and Yellow Cab also criticize Tesfa's initial lack of understanding of the rules governing his proposed business. Albuquerque Cab and Yellow Cab complained that Tesfa repeated, "I will ask my lawyer" in his testimony when questioned about various rules, procedures, and practices. The hearing examiner was suspicious of Tesfa's claims not to understand English and thought that some of Tesfa's misrepresentations—including signing a statement that he had read the Motor Carrier Act before he actually had—could not be attributed to language difficulties. The hearing examiner also believed Tesfa had lied about market research, claiming at his deposition to have talked to people and watched people taking taxis when on cross-examination it came to light that he had only read online reviews on Yelp.

16

{30} The PRC and Q Cab characterize the same behaviors very differently, attributing them to honest mistakes and Tesfa's difficulty understanding English, and point out that Tesfa has since remedied any shortcomings in his application. Tesfa explained that he did not understand the significance of the numbers when he photographed them on his car but had seen similar numbers on other taxicabs, that he wanted to show his friends how his taxicab would look, and that all signage was removed from his taxicab before the hearing. Tesfa and the PRC Transportation Division staff maintain that by the time of the hearing, Tesfa had undertaken "a course of action to get each [regulatory] requirement met" without regard to expense, had utilized legal services to compensate for the language barrier, "had met all requirements for certification, [and] was compliant with state law . . . and compliant with the [statutory] fitness requirements." At the hearing on May 9, 2016, Tesfa testified that he had read and understood the applicable regulations.

{31} The PRC could have reasonably found either for or against Q Cab on the issue of fitness to operate, but substantial evidence supports the determination of fitness that the PRC made. It is not necessary to decide whether legal but false representations need to be considered in an evaluation of fitness under Section 65-2A-3(R) (2013) because the PRC determined that Tesfa's misrepresentations were

17

innocent, not sinister, and that he had cured them. This was a highly fact-based finding within PRC discretion, and we defer to it.

{32} We also reject the suggestion by Albuquerque Cab and Yellow Cab that the PRC unlawfully declined to follow the findings of the hearing examiner on the issue of fitness. Albuquerque Cab argues that PRC "regulations require that PRC decisions state reasons for deviating from a hearing officer's findings and conclusions," in reliance on 1.2.2.37(A)(3) NMAC: "The commission may issue an order which makes reference to the recommended decision and indicate disagreements with the hearing examiner and the commission may make further or modified findings and conclusions based on the record." Contrary to the argument of Albuquerque Cab, the permissive wording of that regulatory provision allows for discretion in the scope and content of final PRC orders when the PRC disagrees with a hearing examiner's findings.

{33} An agency need not expressly articulate reasoning for a decision as long as the record contains sufficient support for it. *See Regents of the Univ. of Cal. v. N.M. Water Quality Control Comm'n*, 2004-NMCA-073, ¶¶ 13-14, 136 N.M. 45, 94 P.3d 788 (describing the requirement to articulate its reasoning as "unduly onerous for the [c]ommission and unnecessary for the purposes of appellate review" where a sufficient record exists); *see also Bass Enters. Prod. Co. v. Mosaic Potash Carlsbad*

*Inc.*, 2010-NMCA-065, ¶ 48, 148 N.M. 516, 238 P.3d 885 (requiring "a rational connection between the facts found and choices made" by the PRC in its order). While it would have been more helpful to this Court if the PRC included in the record an explanation of the reasoning underlying its Final Order, we cannot hold that it was unlawful for the PRC to omit it.

**E.     It is Unnecessary to Reach Q Cab's Constitutionality Argument**

{34}     Q Cab argues that Section 65-2A-13(D)(2), if its intent is to serve as a de facto bar on general taxicab applicants in municipal taxicab territory, improperly "allows incumbents to immunize themselves from price competition under color of law." Because we decide this case on other grounds, we decline to reach this constitutional issue.

**III.     CONCLUSION**

{35}     We affirm the Final Order of the PRC in this case.

{36}     **IT IS SO ORDERED.**


_____

**CHARLES W. DANIELS, Justice**


19

**WE CONCUR:**

_____
**JUDITH K. NAKAMURA, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**BARBARA J. VIGIL, Justice**