The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: May 16, 2022

**Nos. A-1-CA-38474 and A-1-CA-38478**
**(consolidated for purpose of opinion)**

**ELEPHANT BUTTE IRRIGATION**
**DISTRICT,**

      Petitioner-Appellant,

and

**TURNER RANCH PROPERTIES, L.P.;**
**HILLSBORO PITCHFORK RANCH, LLC;**
**and GILA RESOURCES INFORMATION**
**PROJECT,**

      Petitioners-Appellants,

v.

**NEW MEXICO WATER QUALITY**
**CONTROL COMMISSION,**

      Respondent-Appellee,

and

**NEW MEXICO COPPER CORPORATION**
**and NEW MEXICO ENVIRONMENT**
**DEPARTMENT,**

Intervenors-Appellees,


**IN THE MATTER OF THE APPLICATION
FOR NEW MEXICO COPPER CORPORATION
FOR A GROUND WATER DISCHARGE
PERMIT FOR THE COPPER FLAT MINE, DP-
1840, DOCKETED AS GWB 18-06(P).**

**APPEAL FROM THE WATER QUALITY CONTROL COMMISSION**
**Jennifer J. Pruett, Chair**

Barncastle Law Firm
Samantha R. Barncastle
Las Cruces, NM

for Appellant Elephant Butte Irrigation District

New Mexico Environmental Law Center
Charles de Saillan
Santa Fe, NM

for Appellants Turner Ranch Properties, L.P., Hillsboro Pitchfork Ranch, LLC, and
Gila Resources Information Project

Hector H. Balderas, Attorney General
Robert F. Sánchez, Assistant Attorney General
Santa Fe, NM

for Appellee New Mexico Water Quality Control Commission

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Stuart R. Butzier
Christina C. Sheehan
Albuquerque, NM

for Appellee New Mexico Copper Corporation

Andrew P. Knight, Special Assistant Attorney General
Albuquerque, NM

for Appellee New Mexico Environment Department

## OPINION

**HANISEE, Chief Judge.**

{1}   These appeals arise from an order of the New Mexico Water Quality Control Commission (the Commission) upholding the grant of New Mexico Copper Corporation's (N.M. Copper) application for a discharge permit for the Copper Flat Mine (the Mine) in Sierra County, New Mexico issued by the New Mexico Environment Department (the Department) under the New Mexico Water Quality Act (the Act), NMSA 1978, §§ 74-6-1 to -17 (1967, as amended through 2019), and its implementing regulations, 20.6.2 NMAC and 20.6.7 NMAC.[1] Determining that, in upholding the grant of the discharge permit (DP-1840), the Commission did not act arbitrarily, capriciously, or otherwise not in accordance with the law, we affirm.

## BACKGROUND

### A.   The New Mexico Water Quality Act

{2}   Before turning to the facts at hand, we first provide a brief overview of the statutory framework governing the issues before us. The Act was enacted by the New Mexico Legislature who sought "to abate and prevent water pollution." *Bokum Res. Corp. v. N.M. Water Quality Control Comm'n*, 1979-NMSC-090, ¶ 59, 93 N.M.

---

[1]This opinion resolves the parties' challenges to the Commission's Order in case numbers A-1-CA-38474 and A-1-CA-38478. Because these cases raise related issues arising from the same application for a discharge permit, we consolidate both for decision. *See* Rule 12-317(B) NMRA.

546, 603 P.2d 285. The Act authorizes the Commission to "adopt water quality standards for surface and ground waters of the state," which must "protect the public health or welfare, enhance the quality of water and serve the purposes of the . . . Act." Section 74-6-4(C). The Act provides that, "the [C]ommission may require persons to obtain from a constituent agency designated by the [C]ommission a permit for the discharge of any water contaminant or for the disposal or reuse of septage or sludge." Section 74-6-5(A). The Act further mandates that the constituent agency shall deny any application for a permit if:

(1)     the effluent would not meet applicable state or federal effluent regulations, standards of performance or limitations;

(2)     any provision of the . . . Act would be violated;

(3)     the discharge would cause or contribute to water contaminant levels in excess of any state or federal standard.

Section 74-6-5(E).

{3}     In 2009, the Act was amended to direct the Commission to adopt regulations particular to specific industries, including the copper mining industry, specifying "the measures to be taken to prevent water pollution and to monitor water quality." Section 74-6-4(K); *Gila Res. Info. Project v. N.M. Water Quality Control Comm'n*, 2018-NMSC-025, ¶ 3, 417 P.3d 369. The regulations were to be developed by the Department and proposed for adoption by the Commission. Section 74-6-4(K). Pursuant to these regulations, the Department proposed and the Commission adopted

2

the Copper Rule. *See Gila Res. Info. Project*, 2018-NMSC-025, ¶ 1 (affirming the Commission's adoption of the Copper Rule). The Copper Rule is a "supplement [to] the general permitting requirements . . . to control discharges of water contaminants specific to copper mine facilities." 20.6.7.6 NMAC. The Copper Rule acknowledges that "open pit copper mining leads inevitably to some degree of contaminant discharge" and "operates from the premise that the most effective way to mitigate these inevitable discharges is through containment." *Gila Res. Info. Project*, 2018-NMSC-025, ¶ 43. Considering the inevitable discharges associated with open pit copper mining, the Copper Rule specifies that "[d]uring operation of an open pit," the groundwater quality standards set forth by 20.6.2.3103 NMAC "do not apply within the area of open pit hydrologic containment." 20.6.7.24(D) NMAC.

## B. DP-1840 and the Relevant Proceedings

{4}     We now describe the factual background leading to this appeal. N.M. Copper intends to reopen and operate the Mine, a historic open pit copper mine located approximately five miles northeast of Hillsboro in Sierra County, New Mexico. The Mine sits adjacent to and shares a border with both Hillsboro Ranch Properties and the Ladder Ranch (collectively, the Ranches). Several mining companies have attempted to operate the Mine over the past fifty years. *See State ex. rel. Off. of State Eng'r v. Elephant Butte Irrigation Dist.*, 2021-NMCA-066, ¶¶ 6-31, 499 P.3d 690 (explaining the complex history of the ownership and operation of the mine). In

2009, N.M. Copper entered into an agreement to purchase the Mine and associated mineral claims, and did so in 2011.

{5} In March 2011, N.M. Copper submitted an application to the Department for a modification of the existing groundwater discharge permit for the Mine. In February 2018, the Department's Groundwater Quality Bureau published a public notice of the Department's proposal to issue DP-1840, stating that the Department would accept public comment on the proposed permit for thirty days, which was extended for an additional sixty days at the request of several parties. The Department held a public hearing on the proposed permit from September 24-28, 2018, at which N.M. Copper, the Department, as well as the Ranches and the Elephant Butte Irrigation District (EBID) (collectively, Appellants) presented the testimony of technical witnesses. As well, forty-eight members of the general public made oral statements. In December 2018, the Administrative Hearing Officer (AHO) issued a report (the AHO Report) alongside proposed findings of fact and conclusions of law, determining that the discharge did not pose an "undue risk to property" and that the open pit water body will not be a water of the state, and therefore is not subject to surface water quality standards. That same month, the Secretary of the Department (the Secretary) issued its order (the NMED Order), in which the Secretary adopted the AHO's Report of proposed findings of fact and conclusions of law and added thirteen additional findings and conclusions. Finally,

in September 2019, the Commission adopted its final order (the Final Order), adopting the NMED Order with additional revisions, and granting N.M. Copper's application for DP-1840. DP-1840 authorizes N.M. Copper to discharge a maximum 25,264,000 gallons per day of tailings slurry, including "mine tailings, process water, impacted storm[]water, and domestic wastewater to a lined tailing impoundment," known as the Tailings Storage Facility. Additionally, DP-1840 regulates "discharges from other mine units, including waste rock stockpiles, ore stockpiles, mineral processing units, process water impoundments, an open pit, sumps, tanks, pipelines, and other areas within the permit boundary of approximately 2,190 acres."

## C.    The Final Order

{6}    In the Final Order, the Commission concluded that the opposing parties, including EBID and the Ranches, "did not prove that the discharges from DP-1840's permitted mine operations will cause undue risk to [the Ranches'] property." Although the Commission provided only limited insight into its reasoning, through the NMED Order the Secretary explained that "[t]he phrase 'undue risk to property' as used in the Copper Rule pertains to potential impacts to water quality from the permitted discharges, not to the depletion of groundwater." Similarly, the Secretary explained that its conclusion that "the discharges from permitted mine operations will not cause undue risk to the property of the Ranches, or [EBID], or anyone else" was based on a totality of expert witness testimony, specifically expert testimony

5

based on "site-specific modeling and analysis, and addressed scientific likelihoods rather than speculation." And while the Final Order issued by the Commission did not articulate specific reasoning as it relates to the proposed pit lake, the Secretary explained, "The future pit lake at Copper Flat will not be a surface water of the state subject to the water quality standards in 20.6.4 NMAC."

**DISCUSSION**

{7}     EBID asserts that in granting N.M. Copper's discharge permit the Commission "ignored its determination that the phrase 'undue risk to property' as used in the Copper Rule, 20.6.7 NMAC, may be broader than potential impacts to water quality from the permitted discharges."[2] The Ranches similarly contend that

---

[2]EBID additionally contends that that the Commission "failed to consider that the Department had failed to engage in appropriate interagency coordination related to the [Mine], which itself, poses an undue risk to the Elephant Butte Irrigation District." Specifically, EBID argues that "it would have assisted the [AHO] and the Secretary" when evaluating the risk to property presented by the Mine to "have access to items that are part of the [State Engineer's] Dam Safety Bureau application process," such as a design report, operation and maintenance manual, and emergency action plan. Similarly, EBID asserts that an emergency action plan developed in collaboration with EBID, the U.S. Bureau of Reclamation and all affected state agencies that addresses catastrophic events "should have been required as a permit condition" to ensure that the Mine does not pose an "undue risk to property." While EBID emphasizes the importance of such coordinated efforts, it is not supported by statutory authority requiring such efforts. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 ("We assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority. . . . Issues raised in appellate briefs which are unsupported by cited authority will not be reviewed by us on appeal." (citation omitted)). Our own research has revealed no such requirements, much less authority suggesting such an omission would be structurally fatal to a discharge permit. Because we have no

6

the Commission failed to adequately explain its conclusion that DP-1840 will not pose an "undue risk to property." Additionally, the Ranches assert that DP-1840 violates the Act, and the Commission did not adequately explain its conclusion that surface water standards will not apply to the pit lake. We first set forth the standard of review, then analyze Appellants' arguments as they relate to the Commission's interpretation of "undue risk to property," and then turn to the Ranches' remaining arguments.

## I.    Standard of Review

{8}    The Act provides that we "shall set aside the [C]ommission's action only if it is found to be: (1) arbitrary, capricious, or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Section 74-6-7(B). "A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." *Colonias Dev. Council v. Rhino Env't Servs.*, 2005-NMSC-024, ¶ 13, 138 N.M. 133, 117 P.3d 939 (internal quotation marks and citation omitted). Additionally, "[a]n agency's action is arbitrary and capricious if it provides no rational connection between the facts found and the choices made, or entirely omits consideration of relevant factors or important aspects of the problem at hand."

---

authority to apply conditions not within the Act, nor employ regulations not promulgated by the Commission, we reject these arguments.

7

*Albuquerque Cab Co. v. N.M. Pub. Regul. Comm'n*, 2017-NMSC-028, ¶ 8, 404 P.3d 1 (internal quotation marks and citation omitted). An agency decision is not in accordance with the law "if the agency unreasonably or unlawfully misinterprets or misapplies the law." *Princeton Place v. N.M. Hum. Servs. Dep't*, 2018-NMCA-036, ¶ 27, 419 P.3d 194 (internal quotation marks and citation omitted), *rev'd on other grounds*, 2022-NMSC-005, ¶ 3.

{9}     Although not bound by the agency's interpretation, we "confer a heightened degree of deference to legal questions that implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function." *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 904 P.2d 28 (internal quotation marks and citation omitted). However, "statutory construction itself is not a matter within the purview of the [agency]'s expertise," so we "afford little, if any, deference to the [agency]" on questions of law not involving this expertise or policy determination. *N.M. Indus. Energy Consumers v. N.M. Pub. Regul. Comm'n*, 2007-NMSC-053, ¶ 19, 142 N.M. 533, 168 P.3d 105 (internal quotation marks and citation omitted).

## II.     The Commission's Order Determining That the Mine Did Not Pose an Undue Risk to Property Was Not Arbitrary, Capricious, or Otherwise Not in Accordance With the Law

{10}     The parties dispute the meaning and factors that must be considered in determining whether a discharge permit creates an "undue risk to property." EBID

8

and the Ranches contend that "undue risk" should encompass the Mine's impact on both water quality and quantity. They also argue that they presented compelling evidence of an "undue risk" to their respective properties from both contamination and depletion.

## A.  The Scope of "Undue Risk"

{11}  Appellants contend that the Commission erred in determining that the Mine did not present "an undue risk to property" because the Commission failed to consider the Mine's inevitable depletion of surface water. EBID asserts that because the Commission did not provide a definition of the phrase, but instead explained that the consideration of undue risk "may be broader than potential impacts to water quality from the permitted discharges and shall be reviewed on a case[-]by[-]case basis," the Commission rendered the phrase "superfluous in violation of the law."[3]

---

[3] EBID similarly contends that the meaning of "undue risk" requires a consideration of depletion because the Commission rejected the Secretary's finding No. 4 which provided, "the phrase undue risk to property pertains to potential impacts to water quality from the permitted discharges, not to the depletion of groundwater" and instead explained that "the phrase . . . as used in the Copper Rule 20.6.7 NMAC, may be broader than potential impacts to water quality from the proposed discharges and shall be reviewed on a case[-]by[-]case basis." We disagree. Such modified language employed by the Commission does not mean that it considered, or must consider, potential depletion of groundwater in its discharge determination. Rather, in replacing the limiting language set forth by the Secretary, the Commission explained that in making a determination that a discharge permit poses an "undue risk," it may broadly consider "potential impacts to water quality." We simply do not view the Commission as having—by rejecting the Secretary's wording in its order applicable only to this case—expanded the permit application process beyond the context of the discharge at issue on a case-by-case basis. Indeed,

9

Similarly, the Ranches argue that because the Commission failed to consider the relevant factor of water depletion, its order is arbitrary, capricious, or an abuse of discretion.

{12} We disagree with Appellants' contention that a determination of whether a mine presents "an undue risk to property" requires consideration of potential depletion. This appeal arises from an order granting an application for a discharge permit, and the scope of the issues available for our review are neither broader nor narrower than that. Granting a discharge permit requires compliance with the Copper Rule and a determination that any discharge authorized under a permit creates no hazard to public health nor undue risk to property owners. 20.6.7.10(J) NMAC. Thus, any challenge asserting that the permit should not be granted must relate to "undue risk" attributed to the discharge authorized under DP-1840. As the NMED Order provides, DP-1840 "only regulates discharges of water at the [M]ine site," and "does not allocate water for use . . . or permit the pumping of groundwater." Stated differently, DP-1840 has nothing to with and does not authorize or permit water from any source to be used at the Mine. Indeed, neither the Department nor the Commission has the authority to regulate the source from which a discharger

---

to do so would require more than a vague declaration lacking regulatory specificity. In any event, the Commission did not expressly provide that depletion is a factor to be considered in making a determination that a discharge permit would create an "undue risk to property."

receives the water that is utilized in the processes resulting in the discharge. Rather, our Legislature has delegated such authority solely to the Office of the State Engineer. *See* NMSA 1978, § 72-2-9 (1907) ("The state engineer shall have the supervision of the apportionment of water in this state according to the licenses issued by him and his predecessors and the adjudications of the courts."); *see also* NMSA 1978, § 72-2-9.1(B)(2-3) (2003) ("The state engineer shall adopt rules for priority administration . . . so as to create no impairment of water rights . . . and . . . so as to create no increased depletions.").

{13} At oral argument for this appeal, when asked to define the phrase, the Department described "undue risk to property" to be "a larger than acceptable chance that these discharges permitted by this permit [would] cause harm to surrounding properties." While we accept for purposes of this appeal—and given that there is no statutory, regulatory or jurisdictional direction pointing this Court to a broader or more inclusive inquiry in the context of a discharge permit—the Commission's interpretation of the phrase "undue risk to property," we decline to formally adopt the definition provided by the Department. The formal adoption of such an interpretation, or a different one altogether, requires agency rulemaking in our view. *See New Energy Econ., Inc. v. Shoobridge*, 2010-NMSC-049, ¶ 14, 149 N.M. 42, 243 P.3d 746 (explaining that the Legislature "delegate[s] both adjudicative and rule-making power to administrative agencies"); *see also*

11

*Earthworks' Oil & Gas Accountability Project v. N.M. Oil Conservation Comm'n*, 2016-NMCA-055, ¶ 8, 347 P.3d 710 ("A court may not intervene in administrative rule-making proceedings before the adoption of a rule or regulation." (alteration, internal quotation marks, and citation omitted)). Although the phrase "undue risk to property" does not include technical language such that it would be beyond the understanding of those without expertise, the question of what constitutes an "undue risk" requires agency knowledge within the scope of the Commission's statutory function. *See Morningstar*, 1995-NMSC-062, ¶ 11 (explaining that although not bound by the agency's interpretation, "[t]he [C]ourt will confer a heightened degree of deference to legal questions that implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function." (internal quotation marks and citation omitted)); *see also Gila Res. Info. Project*, 2018-NMSC-025, ¶ 35 ("We will overturn the administrative construction of statutes by appropriate agencies *only if they are clearly incorrect*." (internal quotation marks and citation omitted)).

{14}   We therefore conclude that the Commission's Final Order, as it relates to the scope of "undue risk to property" and its related decision not to consider potential depletion, was not arbitrary, capricious, or otherwise not in accordance with the law. Nothing the Commission said within the Final Order or adopted or modified from the wording employed by the Secretary convinces us otherwise. We now turn to

12

Appellants' contentions that the Commission failed to adequately address compelling evidence of "undue risk" to their respective properties.

**B.      The Sufficiency of the Commission's Final Order**

{15}      We review the Commission's Final Order to determine if it is supported by substantial evidence. "For questions of fact, [the appellate court] looks to the whole record to determine whether substantial evidence supports the [agency]'s decision." *Pub. Serv. Co. of N.M. v. N.M. Pub. Regul. Comm'n*, 2019-NMSC-012, ¶ 14, 444 P.3d 460 (alteration, internal quotation marks, and citation omitted). "Substantial evidence requires that there is evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency." *Id.* (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole is evidence demonstrating the reasonableness of an agency's decision, and we neither reweigh the evidence nor replace the fact[-]finder's conclusions with our own." *Albuquerque Bernalillo Cnty. Water Util. Auth. v. N.M. Pub. Regul. Comm'n*, 2010-NMSC-013, ¶ 18, 148 N.M. 21, 229 P.3d 494 (internal quotation marks and citation omitted).

{16}      In applying whole record review, we consider the AHO's Report, as well as the NMED Order and the Commission's Final Order. Over the course of a five-day hearing in September 2018, the AHO considered an assortment of evidence, including expert testimony from N.M. Copper, EBID, and the Ranches, as well as

13

public comment and nearly 18,000 pages of administrative record. Although the AHO recognized that "[t]he fears expressed by the Ranches, EBID, and many of the public commenters are understandable," the AHO declared, "Migration of significant water contaminants over very long distances, or in directions contrary to typical groundwater flow" to be unlikely. To best understand the AHO's conclusion that such contamination is unlikely, we highlight selected findings of fact provided in the AHO's Report, and emphasize that neither EBID nor the Ranches challenges the AHO's findings of fact.

{17} The AHO Report notes that N.M. Copper used "[forty] years of data from exploration drilling programs, monitoring wells, aquifer testing, including groundwater samples from the previous mining operations . . . to characterize the hydrologic settling of the [M]ine site." The AHO Report also explains that the East Animas Fault—which sits adjacent to the Mine—"could not serve as a conduit for the migration of contaminants through groundwater flow" as the "general direction of the groundwater flow at the [M]ine site is west to east." Regarding the waste rock stockpiles, the AHO concluded that "[n]o impacts to groundwater will occur should there be any seepage," and if seepage did occur, "all parameters of predicted groundwater chemistry are below New Mexico's groundwater standards." Similarly, addressing the Tailings Storage Facility, the AHO determined that "[t]here will be no water quality impacts to groundwater or surface water from the [facility]."

14

Because these uncontested findings of fact require the application and understanding of technical expertise, we accord them proper deference. *See Pickett Ranch, LLC v. Curry*, 2006-NMCA-082, ¶ 49, 140 N.M. 49, 139 P.3d 209 ("Particularly where specialized technical or scientific knowledge is involved, we will give great deference to an agency's factual findings.").

{18} The AHO Report underscored that "what constitutes 'undue risk' in connection with the issuance of a groundwater discharge permit has not been set out in a regulation or guidance document, statute or New Mexico case law," and expressly declined to make a recommendation regarding undue risk. However, the AHO noted that "[a]part from this issue of undue risk, the recommended findings and conclusions support the issuance of . . . [DP-1840] as based on substantial evidence." Although the AHO declined to make a conclusion regarding undue risk, we conclude that substantial evidence, including the evidence highlighted above, supports the Commission's Final Order determining that the Mine does not present an "undue risk to property."

{19} In the Final Order, the Commission also noted that its "decision [to grant DP-1840] is based on the totality of expert witness testimony . . . with more weight given to that from experts who based their conclusions on site-specific modeling and analysis and who addressed scientific likelihoods rather than speculation." The Ranches contend that this "is hardly a sufficient explanation of the Commission's

decision," and argues that the Commission should have identified which evidence it found to be speculative. In asking us to consider the evidence and expert testimony it presented, the Ranches effectively ask us to reweigh the evidence, which we cannot do. *See Albuquerque Bernalillo Cnty. Water Util. Auth.*, 2010-NMSC-013, ¶ 18. Moreover, at oral argument, the Ranches described the nature of the expert testimony of its hydrologists, explaining generally that one or more of them told the AHO that the East Animas Fault "could actually serve as a conduit and move the contamination in unpredictable ways." We need not conclude that such evidence is or is not speculative, or whether it is persuasive or unpersuasive. Instead, we emphasize only that it appears to be reasonable for the AHO, and later the Commission, to give less weight to this evidence and hold that the factual findings of the AHO are supported by substantial evidence. *See Montano v. N.M. Real Est. Appraiser's Bd.*, 2009-NMCA-009, ¶ 8, 145 N.M. 494, 200 P.3d 544 ("We will not disturb the agency's factual findings [that are] supported by substantial evidence.").

{20}     Because we decline to disturb the uncontested factual findings within the AHO Report, and determine that the Commission's Final Order as it relies on such factual findings is supported by substantial evidence, we hold that the Commission's determination that the Mine does not pose undue risk to property is not arbitrary, capricious, or otherwise not in accordance with the law.

**III. DP-1840 Does Not Violate the Act and the Commission's Order Determining That the Pit Lake Is Not a Surface Water of the State Is Not Arbitrary, Capricious, or Otherwise Not in Accordance With the Law**

{21} In addition to the arguments raised by both Appellants related to the Commission's interpretation of "undue risk to property," the Ranches additionally assert that DP-1840 violates the Act because (1) the future pit lake will be a surface water of the state, and (2) DP-1840 will cause water contaminant levels in excess of state standards. In making these arguments, the Ranches contend that the Commission failed to adequately explain its conclusion that the pit lake is not a surface water of the state. The Department answers that the Commission correctly concluded that the water in the future open pit is eligible for the private waters exemption under the Act because there is no potential for outward migration from the pit such that water will contaminate other surface or groundwater. Agreeing with the Department that the pit lake is eligible for the private waters exemption of the Act, the Commission explains that the pit lake does not fall within the definition of "surface waters" of the State as it is not "naturally occurring," a tributary, a "manmade bod[y] of water that [was] originally created in surface waters," or a water of the United States. *See* 20.6.4.7(S)(5) NMAC. To address the Ranches' arguments, we briefly discuss New Mexico's surface waters of the state rule, then address the Commission's Final Order as it relates to the pit lake.

**A.    "Surface Waters of the State"**

17

{22}     All surface waters of the state of New Mexico are subject to the water standards set forth by the Act. Pursuant to 20.6.4.7(S)(5)(a) NMAC, "surface waters of the state" are defined broadly as "all surface waters situated wholly or partly within or bordering upon the state," including lakes, rivers, streams, wetlands, wet meadows, reservoirs and natural ponds and all tributaries of such waters, including "any manmade bodies of water that were originally created in surface waters of the state or resulted in the impoundment of surface waters of the state, and any 'waters of the United States' as defined under the Clean Water Act that are not included in the preceding description." 20.6.4.7(S)(5)(b) NMAC. However, this expansive definition "does not include private waters that do not combine with other surface or subsurface water." 20.6.4.7.S(5)(c) NMAC. The private waters exemption, which the Commission determined is applicable to the pit lake, derives from the statutory definition of "water" in the Act. Under the Act, "water" means "all water, including water situated wholly or partly within or bordering upon the state, whether surface or subsurface, public or private, *except private waters that do not combine with other surface or subsurface water*." Section 74-6-2(H) (emphasis added). In other words, as the AHO correctly explained, "[t]o be exempt from the definition of a "[s]urface waters of the state" and therefore not subject to the requirements of the Act, "a water body[] (1) must not combine with other surface or subsurface waters, (2) must not be a water of the United States, and (3) must be located entirely on private lands."

18

**B.  The Commission's Order**

{23}  The Ranches contend that the "Commission did not adequately explain its conclusion that surface water standards will not apply to the pit lake," and argues that the pit lake is encompassed within the expansive definition of surface waters of the state because it will combine with surface waters—"act[ing] as a hydraulic sink, drawing in groundwater from the surrounding areas, and that water will combine with the water in the lake." The Department, the Commission, and N.M. Copper respond that the Commission correctly upheld the Department's conclusion because the pit lake does not meet the regulatory definition of surface waters of the state as it will be located entirely on private land, and will not combine with other surface water or ground water.

{24}  In determining that the pit lake qualifies for the private waters exemption, the Commission adopted the AHO and Department's reasoning that the pit lake will not combine with other surface waters, such to render it a surface water of the state. The AHO explained that the Department's understanding of the phrase "combine with other surface or subsurface waters" as contemplated by the private waters exemption "refers only to water flowing out of a polluted water body into surrounding water, and not to surrounding water flowing into a polluted water body." The Ranches are correct that 20.6.4.7.S(5)(c) NMAC, supplying the private waters exemption, does not include such a distinction. However, the application of the private waters

19

exemption requires the application of highly technical agency expertise. *See N.M. Indus. Energy Consumers*, 2007-NMSC-053, ¶ 19 (stating that we "will confer a heightened degree of deference to legal questions that implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function" (internal quotation marks and citation omitted)); *see also Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806 (providing that when resolving ambiguities in regulations, "which an agency is charged with administering, [we] generally will defer to the agency's interpretation if it implicates agency expertise." (internal quotation marks and citation omitted)). We are further persuaded by the evidence relied upon by the Commission in making its determination and adopted in the findings of fact in the AHO's Report, including that the "pit lake will be a hydrologic sink," and that "[t]here will be no outflow to groundwater or surface water,"— meaning that only evaporation will cause water loss in the pit lake—and that "[t]here is no potential that the open pit water body could contaminate any other groundwater or surface water of the [s]tate." Although we decline to formally adopt the distinction set forth in the AHO's Report—because it is not for the Court to establish definitions that are within the purview of our Legislature or appropriate regulatory entity—we conclude that its interpretation of the definition of surface waters of the state and the related private waters exemption is not arbitrary, capricious, or otherwise not in

20

accordance with the law. *See New Energy Econ.*, 2010-NMSC-049, ¶ 14; *Albuquerque Cab Co.*, 2017-NMSC-028, ¶ 8.

## C.     Contaminant Levels in Excess of State Standards

{25}     The Ranches assert that DP-1840 violates Section 74-6-5(E)(3) of the Act, which provides that "[t]he constituent agency shall deny any application for a permit . . . if . . . the discharge would cause or contribute to water contaminant levels in excess of any state or federal standard." The Ranches argue that "[d]ischarges from the disturbed mine areas into the future pit lake will cause [s]tate surface water standards to be exceeded," and contends that N.M. Copper's "own modeling shows that the future pit lake will exceed the applicable surface water standards" of mercury, selenium, and vanadium. Section 74-6-5(E)(3) generally requires the denial of a discharge permit if the anticipated discharge "would cause or contribute to water contaminant levels in excess of [20.6.2.3103 NMAC] standards." *Gila Res. Info. Project*, 2018-NMSC-025, ¶ 22 (internal quotation marks and citation omitted). However, under the Copper Rule, the 20.6.2.3103 NMAC standards are inapplicable to an "area of open pit hydrologic containment." 20.6.7.24(D) NMAC; *see Gila Res. Info. Project*, 2018-NMSC-025, ¶ 43 (acknowledging that under the Copper Rule the standards set forth by 20.6.2.3103 NMAC may be exceeded because the Rule "accepts that some discharge contamination is inevitable, seeks to contain that contamination, and relies on the hydrologic phenomenon produced by the open pit

to contain it"). Because we uphold the Commission's determination that the pit lake is not a surface water of the state, we necessarily conclude that the pit lake is not required to meet the contamination standards in 20.6.2.3103 NMAC.

**CONCLUSION**

{26}     For the reasons articulated above, we conclude that Appellants have not established that the Commission's Final Order upholding the grant of DP-1840—including its interpretation of the phrase "undue risk to property" and its related determination that the Mine does not present an undue risk to their respective properties, as well its conclusion that the pit lake does not constitute a surface water of the state—was arbitrary, capricious, or unsupported by substantial evidence. We, therefore, affirm.

{27}     **IT IS SO ORDERED.**


_____
**J. MILES HANISEE, Chief Judge**

**WE CONCUR:**


_____
**KRISTINA BOGARDUS, Judge**


_____
**JACQUELINE R. MEDINA, Judge**

22